JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, Linda Muhammad Smith, appeals the trial court's granting of summary judgment to defendant, Children's Aid Society ("CAS"), in her discrimination and retaliatory discharge claims. In her cause of action below, Smith claimed discrimination on the basis of race and religion, illegal discharge under the Whistleblower Act, retaliatory discharge for her filing of workers' compensation and EEOC claims, and discharge in violation of public policy.
 {¶ 2} Smith is a licensed social worker with a master's degree. She was hired by CAS on June 25, 2001. Numerous complaints about Smith's job performance ensued. In October 2001, Smith was given a warning letter advising her of the complaints about her interactions with coworkers and clients and notifying her that failure to correct the behavior could result in her termination.
 {¶ 3} On November 15, 2001, Smith filed a complaint with the EEOC charging race and religious discrimination. Complaints about Smith's job performance continued and, in December 2001, CAS extended her 180-day probation period. On February 22, 2002, while on the job, Smith was injured in a car accident, for which injuries she received workers' compensation benefits. CAS, claiming that Smith failed to keep it apprised of her employment status and medical condition, failed to attend a scheduled meeting with her superiors, and failed to work to correct her performance issues, terminated Smith on March 26, 2002.
 {¶ 4} Upon being terminated, Smith filed her complaint charging discrimination and wrongful discharge. The court granted summary judgment to CAS on all issues. This timely appeal followed.
 {¶ 5} Smith asserts five assignments of error, the first of which states:
I. THE COURT RULED IN ERROR THAT PLAINTIFF FAILED TO PRESENT GENUINE ISSUES OF MATERIAL FACT FOR TRIAL AFFIRMATIVELY REFUTING DEFENDANT'S EVIDENCE THAT PLAINTIFF WAS NOT DISCRIMINATED AGAINST CONCERNING HER RACE AND RELIGION.
 {¶ 6} An appellate court reviews a summary judgment de novo.Hillyer v. State Farm Mut. Auto Ins. Co. (1996),131 Ohio App.3d 172, 175. Pursuant to Civ.R. 56(C), summary judgment may be granted under the following conditions: first, no genuine issue of material fact remains to be litigated; second, as a matter of law, the moving party is entitled to judgment; and, third, a review of the evidence shows that reasonable minds can reach only one conclusion, which, when that evidence is viewed most favorably to the party against whom the motion was made, is adverse to the nonmoving party. Temple v. Wean (1977),50 Ohio St.2d 317, 327.
 {¶ 7} Initially, the party seeking summary judgment has the burden of demonstrating the absence of any issue of material fact for trial. Celotex Corp. v. Catrett (1987), 477 U.S. 317, 330. Once the moving party has satisfied that initial burden, however, the nonmoving party then has a similar burden of showing that a genuine issue of fact remains for trial. Dresher v. Burt
(1996), 75 Ohio St.2d 280. If any doubts exist, the issue must be resolved in favor of the nonmoving party. Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 358-59.
 {¶ 8} It is well settled that when a court is presented with a claim for disparate treatment, it must apply the following three-part analysis:
(1) the plaintiff must establish a prima facie case of racial discrimination;
(2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04,36 L.Ed.2d 668, 93 S.Ct. 1817 (1973); Texas Dep't of CommunityAffairs v. Burdine, 450 U.S. 248, 252-53, 67 L.Ed.2d 207,101 S.Ct. 1089 (1981).
Harrison v. Metropolitan Govt. (C.A.6, 1996), 80 F.3d 1107,1115.
 {¶ 9} Therefore, Smith was first required to establish a prima facie case of discrimination. This court has previously explained the necessary elements at this stage:
A prima facie case of discrimination under the McDonnellDouglas framework requires a plaintiff to establish that he or she: (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position either lost or not gained, and (4) that the position remained open or was filled by a person not of the protected class.
Crable v. Nestle USA, Inc., Cuyahoga App. No. 86746,2006-Ohio-2887, ¶ 25.
 {¶ 10} It was undisputed that Smith is a black woman practicing the Islamic religion and is thus a member of a protected class. It was likewise undisputed that she was eventually discharged and replaced by a white woman. CAS maintains, however, that although Smith had the credentials required by the job description, she was nonetheless unqualified for the position because she did not perform the job at a level that met CAS's expectations. Smith thus failed, CAS argues, to establish a prima facie case of discrimination under theMcDonnell Douglas test.
 {¶ 11} In support of its argument that Smith was not qualified for the position, CAS argues that she did not work cooperatively or collaboratively with others. CAS cites the numerous complaints filed by Smith's coworkers, her transfers to different therapy groups, and the extension of her probationary period.
 {¶ 12} These claims, however, cannot at this stage defeat Smith's prima facie showing of discrimination. As we discuss later, CAS cites the identical arguments made here regarding qualification as the basis for its discharge of Smith. Smith argues in turn that all of CAS's arguments are pretextual. Under the proper McDonnell Douglas inquiry, the question of whether the stated reasons for Smith's discharge are pretextual should occur at the third stage. To review CAS's stated reasons for the discharge in the context of Smith's qualifications for the position would effectively deny Smith the opportunity to challenge the reasons as pretextual.
 {¶ 13} The Sixth Circuit Court of Appeals cautioned against strict adherence to the McDonnell Douglas format when the questions of an employee's qualifications for a position and an employer's proffered reason for termination are one and the same:
This may occur, for instance, where the employer claims that the employee was fired due to her failure satisfactorily to perform her job. In such cases, the employer's grounds for the termination may frustrate an employee's ability to satisfy the "qualification" prong of the prima facie case test. Because the question of pretext, however, normally arises only after an employee has established a prima facie case, rigid adherence to the evidentiary scheme of McDonnell Douglass [sic] might effectively deny the employee an opportunity to prove that the proffered grounds for her termination were pretext. We find such an approach ill-advised.
McDermott v. Provident Life and Acc. Ins. Co., 1992 U.S. App. LEXIS 4666, **11-12 (citation omitted).[1]
 {¶ 14} Here, because the issue of Smith's qualifications for the job are so closely intertwined with CAS's proffered reason for her discharge, we find that by demonstrating she possessed the credentials to warrant her hiring for the position, Smith sufficiently demonstrated, at this stage, that she was qualified for the position. She thus met her burden of establishing a prima facie case of racial discrimination.
 {¶ 15} The burden of proof then shifted to CAS. Pursuant to the McDonnell Douglas test, CAS was required to "articulate some legitimate, nondiscriminatory reason for its actions."Harrison, supra, at 1115. CAS argued that Smith was uncooperative and failed to work collaboratively with others.
 {¶ 16} In support of its position, CAS provided copious documentation of complaints about Smith's abrasive and condescending manner, her coworkers' reluctance to talk to her because of her curt and dismissive manner, complaints by coworkers that she interrupted and domineered discussions and treatment sessions, and her failure to respond to voice messages concerning clients. CAS also submitted notes from supervisors that documented inappropriate communications between Smith and outside agencies, family members, and clients. In these communications, Smith discussed the shortcomings of other therapists and complained of mistreatment by CAS.
 {¶ 17} In early October 2001, Smith received a written warning concerning her job performance. In the warning, she was advised of complaints about her negative demeanor and arguments with coworkers and of concerns regarding her style of intervention with clients. Smith was told that a failure to correct the problems outlined in the letter would result in her termination.
 {¶ 18} Moreover, CAS established that Smith was given a copy of its employee manual, which described the consequences of detrimental behavior like that contained in the warning letter:
The agency expects all employees will conduct themselves in a manner which respects the rights * * * of * * * other employees, clients and their families and society as a whole. This manual does not contain a list of employee offenses as the Agency believes that is unnecessary. However, the Agency reserves the right to use disciplinary action including termination of employment in situations where the Agency believes an employee's conduct has been detrimental to the Agency, other employees, clients or their families.
Personnel Manual Book I Agency Handbook II, Defendant Children's Aid Society's Appendix Binder in Support of Motion for Summary Judgment (hereafter Appendix Binder), Item 7, p. 00163.
 {¶ 19} Smith's job description for her position also specifically outlined, in part, her responsibilities: "Coordinate collateral and supportive services to facilitate treatment and to achieve timely discharge so clients stay no longer than symptoms necessitate. * * * Work cooperatively and collaboratively with agency staff to promote quality of care, a positive work environment, and optimum agency functioning. * * * Consult and collaborate with agency staff regarding emotional, behavioral, family, systems, admission and discharge issues of clients. Attend and participate meaningfully in departmental and agency meetings." Appendix Binder, Item 12.
 {¶ 20} CAS thus established that there were clear expectations for the position for which Smith was hired and that the expectations were clearly communicated to Smith. The ongoing, documented complaints about Smith's attitude toward her coworkers and clients, as well as her inability to work collaboratively with others, support CAS's assertion that Smith was terminated because of her failure to satisfactorily perform the job as described. CAS thus put forth a legitimate nondiscriminatory reason for Smith's discharge.
 {¶ 21} The burden then shifted to Smith to demonstrate that a material issue of fact existed on the question of whether CAS's stated reason for the discharge was pretextual. Smith argued fundamentally that "she was the Black Muslim singled out as a troublemaker because the white therapist did not like her methods or approach."
 {¶ 22} At this point, Smith "may not rest upon the mere allegations and denials in the pleadings * * *." Dresher supra at 292-93. She was required to put forth "some significantprobative evidence * * *, which then makes it necessary to resolve the parties' disparate renditions of the dispute."Scarvelli v. Melmont Holding Co. (9th Dist. Nb. 05CA008793),2006-Ohio-4019, ¶ 9, citing 60 Ivy Street Corp. v. Alexander
(C.A.6, 1987), 822 F.2d 1432, 1435. Moreover, it is not the duty of a trial court or an appellate court to weigh the evidence or credibility of Appellant's allegations; that job is properly reserved for the finder of fact. Scarvelli, ¶¶ 13-14. In evaluating a summary judgment motion, however, both courts must consider whether the evidence is probative.
 {¶ 23} In support of her charge of discrimination, Smith alleged the following disparate acts: CAS extended her probationary period, but did not extend the probationary period of white therapists hired at the same time as her; CAS moved her from therapy group to therapy group, but did not similarly transfer white therapists; CAS investigated the complaints about Smith's performance, but failed to follow-up on Smith's complaints about white coworkers; CAS commenced documentation of complaints about Smith's performance only after she had filed an EEOC complaint.
 {¶ 24} Smith has failed, however, to provide documented evidence that would create a material issue of fact on the question of whether CAS's stated reasons for her discharge were pretextual. As discussed above, CAS provided extensive documentation to support its decisions to move Smith from therapy group to therapy group as well as its decision to extend her probationary period. Although Smith claims that there were similar job performance issues with the white therapists hired at the same time, she put no probative evidence in the record to support her claim of disparate treatment. The only documentation Smith offers in support of her conclusory allegations about her white coworkers' poor work performance is an evaluation of one white therapist and an affidavit from a coworker.
 {¶ 25} In the affidavit, one of Smith's coworkers asserts that although supervisors complained about a white therapist's work performance during her probationary period, the therapist was nonetheless made a permanent employee at the conclusion of her probation. Such hearsay from a coworker who did not have access to personnel files is insufficient to create a material issue of fact. Moreover, Smith submits an evaluation of the white therapist in question, an evaluation demonstrating that any prior concerns about the therapist had dissipated and that the therapist had improved her job performance in every area. The evaluation concluded that the therapist was professional and worked well with others.
 {¶ 26} Smith's assertion, furthermore, that the complaints against her ceased when she was moved to a third and final therapy group belies the record before us. Although in this move she was placed with an African-American therapist for the first time, and although the other therapist had no complaints about Smith's work or attitude, there were nonetheless numerous documented complaints about Smith's poor performance during this time period, both from people within and outside of CAS.
 {¶ 27} Moreover, the record contradicts Smith's allegations that the complaints about her job performance commenced after she filed a discrimination claim with the EEOC. Not only did the complaints about Smith clearly begin before she filed her EEOC claim, but she was given a warning letter about her poor job performance well before she filed the EEOC claim.
 {¶ 28} Finally, Smith provides no evidence to support her assertion that CAS failed to investigate her discrimination claim. There is no documentation in the record that, aside from her claim with the EEOC, Smith ever complained to her CAS superiors about discrimination. Instead, her supervisor testified at deposition that Smith never indicated that her disagreements with white coworkers were the result of racial or religious discrimination.
 {¶ 29} In sum, Smith has failed to establish a material issue of fact on the question of whether CAS's stated reasons for her discharge were a pretext for racial or religious discrimination. The trial court, therefore, did not err in granting summary judgment on this claim. Accordingly, the first assignment of error is overruled.
 {¶ 30} For her second assignment of error, Smith states:
II. THE COURT RULED IN ERROR THAT PLAINTIFF FAILED TO PRESENT GENUINE ISSUES OF MATERIAL FACT FOR TRIAL AFFIRMATIVELY REFUTING DEFENDANT'S EVIDENCE THAT PLAINTIFF WAS NOT RETALIATED AGAINST CONCERNING THE WHISTLE-BLOWER STATUTE.
 {¶ 31} Smith claims that she was discharged in retaliation for reporting a medication error to the Franklin County Children and Family Services. She further argues that this retaliation violated the Whistleblower Act.
 {¶ 32} The Whistleblower Act, R.C. 4113.52, protects employees from retaliation for notifying the proper authorities of illegal, dangerous conditions that the employer allows to exist. The statute reads in pertinent part:
If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.
R.C. 4113.52(A)(1)(a).
 {¶ 33} "In order for an employee to be afforded protection as a `whistleblower,' such employee must strictly comply with the dictates of R.C. 4113.52. Failure to do so prevents the employee from claiming the protections embodied in the statute."Contreras v. Ferro Corp. (1995), 73 Ohio St.3d 224, syllabus (emphasis added).
 {¶ 34} Under the specific requirements of the statute, an employee must first notify the employer both orally and in writing of the dangerous condition. The employee must then allow the employer 24 hours to correct or make a good faith effort to correct the condition. It is only after this 24-hour period has passed that the employee is instructed by the statute to notify the proper authority of the condition or violation. "Clearly, the provisions of R.C. 4113.52(A)(1) contemplate that the employer shall be given the opportunity to correct the violation."Contreras at 248.
 {¶ 35} Here, Smith discovered on February 20, 2002, that her 11-year-old client had possibly been over-medicated. After taking the client to the CAS nurse, Smith immediately notified her supervisor both by voice mail and in writing about the situation. That same morning, however, she left a voice mail reporting the error to Franklin County Children and Family Services, the client's guardian. Thus, although Smith complied with the requirement for oral and written notification, she nonetheless failed to comply with the strict requirement that she wait 24 hours before complaining to the authorities.
 {¶ 36} Because Smith failed to "strictly" comply with the requirements of the statute, she thereby deprived her employer of the 24-hour window in which to remedy the cause of the complaint. As a result, Smith is not entitled to the protections afforded by the Whistleblower Act. The trial court thus properly granted the motion for summary judgment on this question. Accordingly, Smith's second assignment of error is overruled.
 {¶ 37} For her third assignment of error, Smith states:
III. THE COURT RULED IN ERROR THAT PLAINTIFF FAILED TO PRESENT GENUINE ISSUES OF MATERIAL FACT FOR TRIAL AFFIRMATIVELY REFUTING DEFENDANT'S EVIDENCE THAT PLAINTIFF WAS NOT RETALIATED AGAINST CONCERNING HER WORKERS' COMPENSATION CLAIM.
 {¶ 38} Smith further argues that her discharge was illegal under R.C. 4123.90, which states in pertinent part:
No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.
 {¶ 39} The Ohio Supreme Court recently held that the protections afforded by the Workers' Compensation Act preclude an employer from discharging an employee for absenteeism due to a work-related injury for which the employee is collecting Total Temporary Disability (TDD) pursuant to R.C. 4123.56. Coolidge v.Riverdale Local School Dist., 100 Ohio St.3d 141, 150,2003-Ohio-5357, ¶ 46. The Supreme Court explained: "In our opinion, the policy of protection embodied in the Workers' Compensation Act can be effectuated only if an employer is not permitted to discharge an employee [under such circumstances]." Id.
 {¶ 40} Preliminarily, CAS argues that the holding inCoolidge cannot apply in the case at bar because Coolidge was decided after the facts in this case transpired. It argues that because the Supreme Court did not expressly make Coolidge
retroactive in application, it is not applicable here. We disagree.
 {¶ 41} The Ohio Supreme Court, as well as this court and numerous other courts, has consistently applied Coolidge
retroactively. See Skilton v. Perry Local School Dist. Bd. ofEduc., 102 Ohio St.3d 173, 2004-Ohio-2239 (applying the law to the nonrenewal of a teaching contract in 2000); Brooks v.Qualchoice, Cuyahoga App. No. 85692, 2005-Ohio-5135 (applyingCoolidge to an injury which occurred 11 months prior to the issuance of Coolidge); see, also, Bickers v. Western So. LifeIns. Co., Hamilton App. No. C-040342, 2006-Ohio-572, ¶ 19 (ordering the trial court to apply Coolidge to an injury which occurred in 1994); State ex rel. Luther v. Ford Motor Co.Batavia Transmission Plant, Franklin App. No. 04AP-1127,2006-Ohio-134, ¶ 12 (ordering the trial court to apply Coolidge
to an injury which occurred prior to issuance of Coolidge).
 {¶ 42} It is undisputed that the injuries Smith suffered in an auto accident were the result of a job-related accident. CAS's termination letter stated that the reason for Smith's discharge was her failure to communicate with CAS concerning her absence due to these injuries and her failure to correct her poor work performance. Specifically, the termination letter alleged that Smith had failed to (1) provide documentation from her doctor regarding her need for time off work, (2) provide CAS with an expected return date, (3) provide a doctor's excuse for her absence from a scheduled meeting with her CAS superiors on March 19, 2002; and (4) work with CAS to address various performance issues that had been raised.
 {¶ 43} In Coolidge, the Ohio Supreme Court specifically addressed the scenario presented when employers argue that employees have not properly communicated about their injuries and leave status with their employer:
[A]n employee who is receiving TDD compensation may not be discharged for failing to complete forms required for a leave of absence, or for failing to notify his or her employer as to the length of the absence, where the employer is otherwise on notice of the employee's condition and status. Moreover, it would be patently illogical to hold that a temporarily and totally disabled employee does not need the employer's permission to be absent from work, only then to turn around and allow the employee to be fired for failing to ask for such permission.
Coolidge, 100 Ohio St.3d at 151, ¶ 50.
 {¶ 44} In Coolidge, the employer alleged that the employee, who had not returned to work for over a year-and-a-half after suffering her work-related injuries, "failed to submit requests for a leave of absence or provide notice of her ongoing status or condition." Id. at 151, ¶ 48. The Ohio Supreme Court noted, however, "the undisputed fact that [the employer] was intimately involved in virtually every aspect of Coolidge's workers' compensation proceedings * * *." Id.
 {¶ 45} Likewise, here, CAS was well aware that Smith had filed a workers' compensation claim and had been awarded Total Temporary Disability compensation, as evidenced by its notice of appeal, dated March 27, 2002, from the decision awarding TDD compensation to Smith. CAS was thus on notice that Smith was collecting TDD compensation for the injuries that prompted her continued absence from work.
 {¶ 46} Moreover, even if Smith were required to demonstrate that she had complied with CAS notice policies regarding her absence, the facts surrounding the communication between Smith and CAS about her injuries and her absence are in dispute. Although Smith's supervisor alleged she never gave him a return date, Smith maintained that she informed her supervisor she would return on a certain date in April. Although CAS claimed that Smith failed to provide requested documentation from her treating physician, Smith asserted that her supervisor told her to bring her medical documentation with her when she returned to work.
 {¶ 47} Further, although the termination letter stated that another ground for Smith's termination was her failure to attend the March 19, 2002 meeting, her immediate supervisor admitted in his deposition that Smith had indeed told him she could not attend the meeting because she had a doctor's appointment at that time.
 {¶ 48} Thus, when viewed in the light most favorable to Smith, the foregoing contradictory testimony and evidence present issues of material fact concerning Smith's assertion that she was illegally discharged because of her workers' compensation claim.
 {¶ 49} For all the reasons stated above, Smith's third assignment of error has merit.
 {¶ 50} For her fourth assignment of error, Smith states:
IV. THE COURT RULED IN ERROR THAT PLAINTIFF FAILED TO PRESENT GENUINE ISSUES OF MATERIAL FACT FOR TRIAL AFFIRMATIVELY REFUTING DEFENDANT'S EVIDENCE THAT PLAINTIFF WAS NOT RETALIATED AGAINST CONCERNING HER EQUAL EMPLOYMENT OPPORTUNITY COMMISSION CLAIM.
 {¶ 51} In this assignment, Smith further claims that her discharge in late March 2002 was a retaliatory response to her filing an EEOC claim on November 15, 2001. Smith has the same burden of proof in her retaliation claim that she has in her discrimination claim.
The plaintiff has the burden of proving a prima facie case of retaliatory discharge, before the employer has to present any evidence that the adverse action against the employee was taken for a legitimate, nondiscriminatory reason. See Texas Dept. ofCommunity Affairs v. Burdine (1981), 450 U.S. 248,67 L.Ed.2d 207, 101 S.Ct. 1089. To make out a prima facie case of retaliatory discharge under Section 2220e-3(a), Title 42, U.S. Code and/or R.C. 4112.02(I), the plaintiff must prove by a preponderance of the evidence that:
1. he is engaged in a protected activity under federal or Ohio law;
2. the employer took adverse action against the plaintiff-employee; and
3. there is a causal connection between the protected activity and the adverse action.
* * *
Briner v. National City Bank (Feb. 7, 1994), Cuyahoga App. No. 64610, 1994 Ohio App. LEXIS 581, *10-11.
 {¶ 52} Smith argues on appeal that she has fulfilled all three prongs of the test. CAS concedes the first two elements: that filing a claim with the EEOC is a protected activity and that CAS took an adverse action against Smith when it terminated her employment. Disputing the third prong, CAS argues there is no evidence that the discharge was connected in any way to the EEOC filing.
 {¶ 53} Smith, on the other hand, asserts that "[t]he remaining element, that the retaliatory action followed the participation in the protected activity in a manner sufficient to warrant an inference of retaliatory motivation * * *" was sufficient to satisfy the third prong of the test. Smith points to the complaints about her performance that were lodged after she filed her complaint with the EEOC. She argues that the supervisors began documenting complaints against her only after she filed the EEOC claim.
 {¶ 54} The evidence shows, however, that the documented complaints about Smith's performance began before she filed her complaint at the EEOC. In fact, the one document Smith cites as evidence of retaliation — a letter of concern (a form of formal discipline on record in the personnel file) documenting her problems in dealing with others — was issued prior to the EEOC filing. Indeed, it appears that the number of complaints decreased after the EEOC filing.
 {¶ 55} Smith also argues that the extension of her probation period was further evidence of retaliation for the filing of the EEOC claim because her white counterparts were not subjected to a similar extension despite complaints about their performances. There is no evidence in the record to support Smith's conclusory allegations that there were formal complaints made about her white colleagues. The evidence instead demonstrates that the extended probation period was CAS's response to Smith's ongoing problems, which were clearly before her filing of the EEOC claim.
 {¶ 56} Smith has thus failed to demonstrate the necessary connection between her EEOC complaint and her discharge. Accordingly, her fourth assignment of error is overruled.
 {¶ 57} For her fifth assignment of error, Smith states:
V. THE COURT RULED IN ERROR THAT THERE IS NO VIOLATION OF PUBLIC POLICY CONCERNING THE TERMINATION OF PLAINTIFF' [sic] EMPLOYMENT.
 {¶ 58} Smith claims that her discharge violated public policy. To establish a violation of public policy, she must demonstrate all of the following:
"1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
"2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
"3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
"4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification
element)." Painter v. Graley (1994), 70 Ohio St.3d 377, 384, quoting H. Perritt, "The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?" (1989), 58 U.Cin.L.Rev. 397, 398-399, emphasis in original.
 {¶ 59} Smith's inability to sustain her claims of racial and religious discrimination, as well as her claims of retaliatory discharge in violation of the Whistleblower Act and for filing an EEOC claim, necessarily precludes any claim that her discharge violated public policy on any of these grounds. As this court concluded in a similar case: "Since plaintiff has failed to establish her discrimination and civil rights retaliation claims, * * * she has not proved that her discharge jeopardized those public policies. Accordingly, the trial court properly granted summary judgment on her wrongful discharge in violation of the public policy claim." Ekstrom v. Cuyahoga Community College,150 Ohio App.3d 169, 183, 2002-Ohio-6228, ¶ 63 (citations omitted).
 {¶ 60} However, because Smith prevails on her assignment of error concerning retaliatory discharge for her workers' compensation claim, we must determine whether her claim that this action concomitantly violated public policy should have survived the motion for summary judgment.
 {¶ 61} As previously discussed, a strong public policy exists to discourage an employer from discharging an employee for absenteeism when that employee is absent due to an injury for which she is receiving TDD compensation. As we held, supra, Smith has demonstrated a material issue of fact as to whether her discharge was motivated by her absenteeism due to a work-related injury for which she was collecting TDD. In the absence of an overriding business justification for the dismissal, which CAS has failed to put forth, the public policy implications of the potentially illegal discharge cannot be ignored.
 {¶ 62} Accordingly, Smith's fifth assignment of error is sustained as to the specific claim that CAS violated public policy when it discharged her for absenteeism when she was collecting TDD compensation. The assignment of error is overruled on the remaining grounds.
 {¶ 63} For the reasons stated herein, the trial court's granting of the motion for summary judgment is affirmed on the claims of race and religious discrimination, as well as retaliatory discharge in violation of both the Whistleblower Act and Ohio Civil Rights law.
 {¶ 64} The judgment is hereby reversed in part and remanded on the issues of wrongful discharge both in retaliation for filing a workers' compensation claim and as a violation of public policy.
Judgment accordingly.
It is ordered that appellant and appellee share the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule
27 of the Rules of Appellate Procedure.
Karpinski, Judge Cooney, P.J., and MCMonagle, J., Concur.
[1] This is a per curiam opinion with the following notice: "NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED." We note that Rule 28(g) provides for the exception when an "unpublished disposition has precedential value in relation to a material issue in a case" and no published opinion "would serve as well."